# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

---

**Saudhy M. Bliss**

      **Plaintiffs,**

                                    **Case No.**

**v.**

**MERRICK B. GARLAND,**
**U.S. ATTORNEY GENERAL,**
**in his official capacity**

      **Defendant.**

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Saudhy M. Bliss complains of Defendant, Merrick B. Garland as Attorney General, in his official capacity as follows:

1. This Court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* 28 U.S.C. § 1367 and 28 U.S.C. § 1391.

2. Plaintiff has complied with all jurisdictional prerequisites to action under Title VII of the Civil Rights Act of 1964 as amended including having exhausted her administrative remedies.

3. Merrick B. Garland is the United States Attorney General and as such directs the United States Department of Justice ("DOJ")

4. The Drug Enforcement Administration ("DEA") is an agency within the United States Department of Justice ("DOJ"). It is directed by an Administrator, currently Ms. Anne M. Milgram. It also has a Principal Deputy Administrator, currently Louis Milione, who serves at the pleasure of the Administrator. The DEA is composed of various departments and divisions, including inspections, human resources, training, enforcement, diversion and intelligence. Preston L. Grubbs, at all times material herein, was the Principal Deputy Administrator, Brian McKnight, at all times material herein served as the Chief Inspector ("CI") who oversaw two entities, the Inspections Division formerly supervised by Deputy Chief Inspector Jeffrey Walsh ("DCI Walsh") and the Office of Professional Responsibility ("OPR"), supervised by Deputy Chief Inspector Gary Owen ("DCI Owen") all of whom, at all times material herein, are or were located in Springfield, Virginia. Human Resources was, at all times material herein, supervised by former Assistant Administrator Sharyn Saunders and the Intelligence Division was supervised by Chief of

Intelligence, Paul Knierim.

DEA is also divided into various operational field divisions, including the Miami Field Division ("MFD") located in Weston, Florida, at which Plaintiff was employed at the time the majority of the acts complained of herein occurred. MFD functions within the entire state of Florida including several District Offices.

5. MFD has a number of district offices ("DO") and Resident Offices (RO") throughout the state of Florida.  The DO that is involved in this matter is the Orlando District Office located in Orlando, Florida which was at all times material supervised by Assistant Special Agent in Charge, Marcus Anderson.

6. The DEA maintains a training facility at Quantico, Virginia which is used for the training of DEA Series 1811, Criminal Investigators ( Special Agents) along with other training facilities for the Diversion Unit, Intelligence Research Specialist among other purposes. The training facility is currently supervised by SAC Michael Barbuti and formerly by SAC Wendy Woolcock. It was at this facility that the majority of the acts complained of herein occurred.

7. The following named DEA personnel are deemed the Responsible Management Officials ("RMOs"), Special Agent in Charge Wendy Woolcock ("SAC Woolcock"), Special Agent in Charge, Michael Barbuti ("SAC

Barbuti"), Assistant Special Agent in Charge Jason Alznauer, ("ASAC Alznauer"), Special Agent Carl Johnson ("SA Johnson"), Special Agent Nicholas Macri ("SA Macri"), Special Agent Timothy Menino ("SA Menino"), Special Agent John Nolan ("SA Nolan") and Unit Chief James De Leo ("Chief De Leo").

8. Plaintiff, Saudhy M. Bliss, was a female DEA Basic Agent Trainee, whose recruitment office was the Orlando District Office.   She is of Hispanic descent.   She was recruited for the DEA in 2018/2019 and was scheduled for Basic Agent Training ("BAT") at the DEA training facility in BAT Class 219 to commence on April 28, 2019. She attended the DEA training facility and fully participated in the training regimen until her unwarranted dismissal approximately three (3) weeks prior to completion of the training regimen.

9. From April 28, 2019 through July 29, 2019, Plaintiff was singled-out, discriminated against based on her sex and race, ethnicity and color (brown) ridiculed, demeaned and treated unfairly, made to perform tasks white females and female non-Hispanics did not have to perform, told she was going to fail before she even attempted the exercise and forced to endure a very hostile work environment.  In general, Plaintiff was treated in a disparate manner than others similarly situated. This mistreatment, discrimination and hostile environment continued at an accelerated pace from April 28, 2019, up to and

including July 26, 2019 when she suffered a serious head injury during a "Raids" training exercise. This disparate and unlawful treatment continued on July 29, 2019 when she was unjustly dismissed from the training facility for alleged combined failures, especially alleged failures in the "Raids" exercises. Finally, Plaintiff was retaliated against because she filed an Equal Employment Opportunity ('EEO") complaint complaining of the mistreatment and unlawful conduct of the supervisory training personnel and other training personnel and the actions of the DEA in unlawfully terminating her employment with the Department of Justice, Drug Enforcement Administration and federal service.

10.     The training facility management, RMO SAC Woolcock, RMO ASAC Alznauer and all other training personnel, including but not limited to Unit Chief De Leo and SA Macri, knowing Plaintiff had suffered a head injury and was bleeding from a simunition round fired by one of the training personnel, failed to properly address the injury or Plaintiff's medical condition in violation of DEA Training Division, Division Order 412, §5.14.2. Said Division Order requires that if a Basic Agent Trainee ("BAT") is injured during a training exercise, training personnel <u>must</u> refer the BAT, in this case, Plaintiff, to the DEA Health Services Unit ("HSU") for a medical consultation. This was not done by several training personnel who had

personal knowledge of the injury.  Despite being required by DEA policy, the training facility management also failed to file the proper documentation to report the injury or assist the Plaintiff in reporting the injury at any time from the date of the injury to Plaintiff's dismissal and at any time thereafter.

11.    Unlike other trainees who suffered an injury at the training facility during a training exercise and received immediate medical assistance, including those in the same BAT Class as the Plaintiff, Plaintiff did not receive any medical attention or assistance by a physician, physician's assistant, registered nurse or any other qualified medical personnel for her injury. After returning to the Orlando, Florida District Office, Plaintiff's injury was diagnosed as a concussion which should have been evident to the training personnel on July 26, 2019 and on July 29, 2019 when Plaintiff was dismissed from the training facility.

12.    On July 29, 2019, after suffering a concussion, Ms. Bliss was wrongfully dismissed from the training facility prior to the completion of the training program for allegedly having failed to meet the training criteria, namely, two "Raids" training exercises.  As stated above, it was during one such "Raids" exercise, Raids Exercise #8, in which Plaintiff was injured and tried to complete that exercise and its requirements thereafter during which she faced ongoing criticism by training personnel despite being seriously injured.

13.    From July 30, 2019 to December 6, 2019, Plaintiff was assigned to the Orlando District Office. Ms. Bliss was employed by the DEA from at least April 28, 2019 to December 6, 2019 when, despite having been injured while employed by the DEA, she was retaliated against for filing an Equal Employment Opportunity complaint on September 21, 2019 by wrongfully terminating her employment with the DEA effective December 6, 2019.

14.    Plaintiff, as ordered by SAC Woolcock, reported to the Orlando DO on July 30, 2019.  Upon her arrival at least two DEA employees noticed that there was something medically wrong with Plaintiff. One of the employees identified the problem as a possible concussion and recommended that Plaintiff seek immediate medical attention at a medical emergency facility.   Plaintiff followed that instruction and she was diagnosed with a concussion and contusion to her forehead.   She was advised to seek treatment from a neurologist which she did.

15.    During the period from July 30, 2019 to December 6, 2019, Miami Field Division Special Agent in Charge, Kevin "Jake" Carter, in conversations with Assistant Administrator Sharyn Saunders, attempted to have the Plaintiff reinstated or a resolution of the issues regarding Plaintiff's injuries and her future with the DEA. Ms. Saunders refused to address the issues at the training facility and advised SAC Carter that it was not his business and she

would make the decisions. Ms. Saunders was primarily concerned with protecting the training personnel, including SAC Woolcock, for their negligence, hostile environment, discrimination and retaliatory conduct.

16.    On or about August 14, 2019 Plaintiff contacted the DEA Equal Employment Opportunity office to register a complaint alleging discrimination, hostile work environment and overall mistreatment.

17.    On September 21, 2019, Plaintiff filed a detailed formal EEO complaint against the Defendant and the Department of Justice, Drug Enforcement Administration naming several individuals as the Responsible management Officials ("RMOs"). The formal complaint serves as a basis for this action.

18.    On October 24, 2019, Plaintiff's allegations of hostile work environment, discrimination based on color (Brown), sex (female) and national origin (Hispanic-Puerto Rican were accepted for investigation.  On January 8, 2020, Plaintiff amended her complaint against the Defendant to add a claim of reprisal for her termination from the DEA on December 6, 2019 and also based on sex, (female), color (Brown) and national origin (Hispanic-Puerto Rico).

19.    Defendant, Merrick B. Garland, in his official capacity, has engaged in and permitted to exist a pattern and practice of discrimination based on gender (female), race, color, national origin, harassment, and the creation and

establishment of a hostile work environment and other unlawful activity, all to the damage of the Plaintiff.  In fact, during the same training regimen, other BATs in Plaintiff's group were harassed and suffered discriminatory conduct, to wit, several black females filed a complaint wherein they alleged, with evidence of the acts of the DEA training personnel, that while they were on the firing range, DEA training personnel made "monkey noises" and other such derogatory and offensive comments. The training supervisory personnel addressed that issue and it ended.   The same personnel allowed the mistreatment of the Plaintiff to continue without interruption.   The only explanation is that this same group of people did not want the Plaintiff, a female Hispanic, to succeed in her training and made sure it happened that way. by and through its employees, including but not limited to the actions of the DEA RMOs, has also engaged in a pattern and practice of retaliation in relation to the filing of Equal Employment Opportunity ("EEO") claims. These include, but are not limited to, retaliation for current EEO claims and for engaging in protected activities, to wit, being a witness in an EEO claim or the report of misconduct. This pattern and persistent practice of discrimination, harassment, hostile work environments and retaliatory conduct has caused reasonable DEA employees to be dissuaded from reporting misconduct of supervisory personnel or other employees.

20.    In the instant matter, it includes fear for reporting misconduct and DEA policy violations by training personnel and supervisory personnel at the Quantico Training facility and in the DEA Human Resource department including the misconduct and unlawful actions of the RMOs named herein, all of which is of record. Such actions result in other reasonable employees being dissuaded from reporting irregularities that occur on regular basis.

21.    In a recent Miami Field Division division-wide inspection August to October, 2020, for example, it was reported that more than twenty percent (20%) of all employees who were asked about filing EEO claims or reporting other forms of misconduct stated that they would not do so after having seen what happens to those who are brave enough, like the Plaintiff herein, to do so.   It is also believed that had the same question been asked and the employees been able to respond anonymously, the percentage would have exceeded fifty percent (50%).

22.    Plaintiff filed a formal EEO complaint on September 21, 2019 and more than 180 days have passed since that point, thus satisfying the jurisdictional requirements of 42 U.S.C § 2000e-16(c).

23.    Ms. Bliss filed her request for a hearing with the EEOC on July 21, 2020 more than 180 days have passed without final action by the EEOC and therefore the administrative remedies as to Ms. Bliss have been exhausted.

24.     Ms. Bliss is a resident of the state of Florida with her residence being located within the jurisdictional boundaries of the United States District Court for the Middle District of Florida and within the boundaries of the DEA Miami Field Division.

## GENERAL ALLEGATIONS

The Defendant, over the last several years, has a history of engaging in numerous acts of discrimination, harassment, retaliation and the creation of retaliatory hostile work environments for female employees, including female Special agents and female Basic Agent Trainees ("BATs"), for administrative personnel, both male and female, for Diversion Investigators, both male and female and for Intelligence Research Specialists.

25.   This unlawful activity has been ongoing and has been allowed to continue as a result of a culture of permitting, acquiescing in and ignoring reported unlawful acts of supervisory personnel, unlawful acts and DEA policy violations by DEA personnel that are discriminatory, abusive, retaliatory and create a hostile work environment for many employees including actions intended to deter DEA personnel from reporting the abusive conduct.  This occurs with the assistance and support from individuals at the training facility, Resident Offices, District Offices and Division Offices and the Senior

Executive Service ("SES") level of management at DEA Headquarters including the Administrator.

26.     The Defendant and the DEA have done little or nothing to prevent such activity and foster a general feeling, a "chilling effect" so-called, throughout the agency that one should not make a complaint or assist another in filing a complaint for harassment, or both, including sexual harassment, hostile work environment and for discrimination on any basis including but not limited to race, gender and ethnicity.  If a complaint of such a nature is filed or if an employee acts as a witness or assists another in the filing of such a complaint, they are targeted for retaliation and other material adverse actions.  This retaliation comes in several forms of material adverse actions, including harassment, limitation of job duties, false accusations of wrongdoing, failure to promote, forced transfers, and involuntary constructive transfers (not by choice but by necessity for their own physical and mental well-being) and compelled to perform their duties in a very hostile work environment.

27.     The Plaintiff faced the ultimate adverse action by having been terminated for filing an EEO complaint. The actions of the Defendant, the Department of Justice and the DEA against her and others would dissuade a reasonable employee from making or supporting a charge of discrimination.

28.     OPR personnel, including inspectors who may have a personal relationship or friendship with those under investigation and fail to disclose such relationships, basically ignore the complaints against the supervisors and other DEA personnel and redirect the investigation into an investigation against the complainants to protect the agency. These unlawful acts occur from the training academy to the operations in the field and to employees of every type at DEA headquarters, Division offices, District offices and Resident offices, including administrative personnel, all acting unlawfully.

29.     The unlawful actions of the DEA supervisory personnel and DEA senior management set forth in detail below in the instant case are merely a microcosm of the harassment, discrimination, retaliation, retaliatory hostile work environments, favoritism, false allegations, bullying and outright unlawful acts and DEA policy violations that occur on a daily basis in the DEA generally and in the DEA training facility specifically.  They continue, and for the most part, are ignored and allowed to continue to exist unabated by DEA senior management and the Defendant, including the Administrator's office, all to the detriment of all of the DEA employees and the DEA's overall stated mission and purpose.

## SPECIFIC ALLEGATIONS

30.    Commencing in May 2019, Plaintiff was pre-selected for special attention from the defensive tactics training personnel.  This pre-selection consisted of being subjected to ridicule, humiliation, being demeaned and treated in an offensive manner which other female or white female BATS did not have to endure.

31.    On June 6, 2019, while in a defensive tactics class, Plaintiff and the other BATs participated in a boxing session.  Each BAT fought another BAT. Plaintiff was in her coupling with BAT Kevin Buechner and SA Johnson was watching them. Plaintiff was having a difficulty breathing due to the punches to her face and stomach area. SA Johnson began screaming at the Plaintiff in a rage and instructed BAT Buechner to "f—her up". Apparently, this language is SA Johnson's and SA Macri's favorite mode of communication as it pertained to the Plaintiff. BAT Buechner, intimidated by SA Johnson, began to continuously punch the Plaintiff in the face and stomach.  Plaintiff asked BAT Buechner to slow down because she could not breathe.  However, SA Johnson got in BAT Buechner's face and yelled at him again to mess her up in foul language or BAT Buechner would have a problem with SA Johnson.  BAT Buechner complied with SA Johnson's demands. Plaintiff told SA Johnson she could not breathe but he responded with additional foul language and acted in a very aggressive and intimidating manner.

Plaintiff was never allowed to fight another female as the other females were allowed to do. She was always paired with males. Also, SA Johnson called her by her first name and everyone else, including other females, were called by their last name. At other times, Plaintiff was told she was a cheater, a loser, asked if she was retarded, treated with hostility and every move was scrutinized.

32.    Plaintiff was treated differently than white female and male trainees on many occasions.  In one instance, during defensive tactics exercises, the BAT class was doing push-ups and sit-ups and SAs Menino, Macri and Johnson would direct profanity towards the Plaintiff but not to white female trainees. Plaintiff was accused of not performing the exercise in a proper manner when that was not the case. In one situation, Plaintiff was next to a white female BAT, another white female BAT and several males.  These two white female BATs would rest and get back up and SA Menino would see them and say nothing to them. However, the instructors would scream at the Plaintiff for allegedly not doing the pushups. The white females were not cursed or screamed at by the SAs.

33.    On another occasion, Plaintiff was training with another BAT, a white female, practicing taking each other down to the floor.  SA Menino approached the two of them and asked Plaintiff to perform the move again while he exhibited dissatisfaction with her. SA Menino required Plaintiff to repeat the

exercise five times.  He only asked the other BAT to do it once despite the fact that they both did the same thing.  SA Menino was intentionally treating the Plaintiff in a disparate manner and humiliating her at every opportunity to do so creating and maintaining a very hostile work environment for the Plaintiff throughout the period of time she was at the training facility.

34.  On July 16, 2019, RMO SA Nolan was overseeing ten to twelve BATs for firearms training.  Plaintiff was included in that group. The BATs were to take out their weapons and fire at a number of stationary metal plates.   This exercise was performed by one person at a time since it was going to be timed by SA Nolan using a monitoring device to record the time when a weapon was fired. SA Nolan handed the device to another BAT, named Baez, so he could record the time when other BATs were shooting.  After BAT Baez used the device, he was instructed by SA Nolan to hand it to the Plaintiff so she could record another BAT when shooting at the plates. Most of the BATs were unfamiliar with the device and did not know how to use it. BAT Baez was familiar with the device and he proceeded to provide a short explanation to Plaintiff in Spanish, her native language, to which she responded in Spanish. SA Nolan, based on his demeanor, was apparently upset with the fact that BAT Baez and Plaintiff communicated in Spanish and stated, in a very strong manner and in Spanish, "Don't speak Spanish, we are in the United States".

Both BAT Baez and Plaintiff were stigmatized by SA Nolan's deep seated anti-Hispanic sentiment and racial bias. There was no danger to other BATs, no one in a firing position and all weapons were holstered. BAT Baez spoke to Counselor Hamelin and he told BAT Baez that DEA does not have a policy regarding the use of a familiar language other than English in any situation. SA Nolan's actions and response were not in support of any DEA policy but a strong example of his bias against individuals of Hispanic descent.

35.  On July 22, 2019, SA Macri and SA Johnson, acting individually and jointly, subjected Plaintiff to a very dangerous, humiliating, demeaning and very hostile environment during a defensive tactics training event. This event took place on the training mat. The class members were required to drag another BAT, BAT Reyes, across the training room while he/she was supposed to be unconscious. Plaintiff, a 145-pound female wearing a 25-pound vest, was the only female intentionally paired up with a 235-pound male with a vest on that weighed an additional 25 pounds. Plaintiff was to drag BAT Reyes a distance of approximately the distance of the size of a basketball court without assistance.

36.  Dragging BAT Reyes was a challenge due to his size and weight. The manner of dragging him was different from that employed by others. Plaintiff had to squat, pull from behind, reposition, catch her breath and continue

dragging Reyes. SA Macri and SA Johnson were screaming at the Plaintiff in an aggressive manner in front of the whole class, using foul language, "hurry the f--- up, you should f---ing quit, you are a loser, you are not meant for this, you just killed your f---ing partner and other demeaning and disgusting comments. SA Johnson got in her face and screamed at her in a rage and in a very intimidating manner. This profanity and offensive conduct was used by SA Johnson and SA Macri from the beginning of the exercise to its conclusion. This treatment followed a prior exercise that required the Plaintiff to drag BAT David Baez, 190 pounds, twice across the mat. No one else was screamed at, cursed at or ridiculed by SA Johnson and SA Macri. SA Macri ultimately played a large role in causing Plaintiff's dismissal from the training facility.

37.   During the exercise mentioned in ¶35 and 36 above, the other females in the BAT Class were allowed to select their own partners. The other females were allowed to drag each other, not compelled to drag a 235-pound male. Plaintiff was singled out for this role thus continuing the ongoing unlawful, discriminatory and hostile treatment of her that was started earlier by DEA training personnel. This whole scenario of abuse was witnessed by one of the BAT Class counselors whose name is unknown.

38.  On or about July, 2019, during Raids Exercise #5, Plaintiff was "looking for work" (looking for suspects) on the second floor of a training building where BATs practiced raids. Plaintiff saw another BAT, BAT Bamberg, enter a room by himself so she assisted him.   Plaintiff went to check a door but it had already been checked per another BAT.   Plaintiff was covering a bedroom door behind BAT Bamberg and covering his back.   Plaintiff asked for "need one" which means another agent.   BAT Barnes entered the room and they cleared the bathroom.  Plaintiff was penalized by SA Macri for not "checking the door". Plaintiff tried to explain her actions to SA Macri, he shut her up and told her that all she could say was "yes sir, no sir".   However, this admonition did not apply to other BATs who were allowed to explain themselves. Plaintiff was not allowed that opportunity by SA Macri.

39.  Plaintiff was told that if she made another mistake, she would fail raids.  The training personnel were doing everything they could to intimidate and threaten the Plaintiff to assure that she would fail and be dismissed from the training facility.   White males and females made the same mistakes or more fatal mistakes and they were not penalized and were corrected in a respectful manner and allowed to explain themselves and why they acted in a certain way during an exercise.  There were a number of mistakes that could get you to fail raids, such as, not engaging, use of excessive force, shoot or kill an

innocent person or having your partner killed.  None of these occurred in Raids #5 or in any other Raids exercise in which Plaintiff was being graded.

40.    In July, 2019, the BATs were involved in vehicle containment exercises. SA Menino scrutinized every move Plaintiff made. On one particular occasion, SA Menino looked at Plaintiff, smiled and wrote in his notebook, "Bliss lost" and smiled.  During this scenario, it was not unusual for the training personnel named in this complaint to find pleasure in seeing Plaintiff suffer pain, be ridiculed, demeaned and "failed" as their goal was to fail the Plaintiff and have her removed from the training facility.

41.    In another vehicle containment exercise, SA Menino treated the Plaintiff with hostility.  He would put his hand on his hip, shake his head and spit on the floor while looking at her. This conduct by SA Menino was not limited to vehicle exercises. He would "find" irrelevant details to accuse her of not performing properly during the exercise.  In this scenario, Plaintiff, after having checked a vehicle trunk, stated "clear" instead of saying "trunk clear" for which SA Menino penalized the Plaintiff.  Two BATs told Plaintiff that it was strange that SA Menino would tell her that because they never say "trunk clear" but "clear", another example of harassment, disparate treatment and discriminatory actions.

42.     In July 2019, Plaintiff was involved in Raids Exercise #6.  In that exercise it was alleged that that Plaintiff made mistakes that were sufficient to fail her in that exercise. Actually, SA Macri added false and inaccurate information to the Basic Agent Trainee Notice of Failure ("BATNF") form.  Also, at the end of Raids #6, SA Macri, in the presence of SA Bellamy, told Plaintiff he was going to fail her on Raids #6.  She tried to explain and clarify SA Macri's subjective and misrepresented scenarios but she was not allowed to do so but other BATs were allowed to do so.  He would use foul and offensive language to the Plaintiff when he commented on her performance.  However, with white females he would offer corrections in a respectful manner. Actions of this nature throughout the training period and especially during Raids Exercises #6 and #8, to follow, were used as a pretext for the discriminatory actions of all of the Responsible management Officials.

43.     During a Raids Exercise #6, a white female BAT was told by SA Macri that she "killed" an innocent person during that exercise and that was murder. However, despite such an error being grounds for failure of the exercise, SA Macri did not fail her because his supervisor, Chief De Leo told him not fail her. That BAT only received a BATNAF stating she needed to improve.  This minor warning was issued because Chief De Leo told the BAT not to worry

because he had her back. This BAT came from the same DEA office as Chief De Leo and received preferential treatment that the Plaintiff did not receive.

44.     After Raids Exercise #6, Plaintiff and another BAT were called into Chief De Leo's office with SA Macri. Both of them were spoken to individually. SA Macri called Plaintiff into a room, advised her that she had failed, gave her the BATNAF and told her to sign it and that she would get remedial that day. The other BAT followed to speak with SA Macri. After the BAT finished, he told the Plaintiff that his BATNAF was not bad but that Plaintiff's was and he would go to remedial with her. If the BAT was not failed, he should not have attended remedial as it is restricted to those who fail an exercise. Allowing the BAT to participate in remedial when he did not fail is preferential treatment that the Plaintiff was never afforded.

45.     When SA Macri failed Plaintiff on Raids Exercise #6, which she knew would happen because of what he told her after the Raids Exercise #5, she approached an SA believed to be SA Starmer, and requested his help because of the way she was being treated by SA Macri and other training personnel and did not know what she was doing wrong because she believed she was performing the same as the other BATs. He agreed to ask the person in charge of Defensive Tactics if he could practice with several BATs on raids. It was approved and during the weekend a group of BATS participated in

raids practice with SA Starmer.  Plaintiff performed several exercises such as dynamic entries, proper positioning and knowledge of tactical entry.  SA Starmer asked what Plaintiff was worrying about because she was performing those exercises correctly.  This affirmation by SA Starmer confirmed that the Plaintiff was actually performing as required but that the SAs during the exercises, including Raids Exercise #5 and #6, were either not paying attention or were deliberately finding fault with Plaintiff's performance of the exercises to harass her and discriminate against her or both.

46.    Throughout the training regimen, commencing in May 2019, SA Menino repeatedly pre-selected Plaintiff for unnecessary "special" attention that resulted in harassment, humiliation and being demeaned in some manner. She would be called up to the front of the class and she would be the example of what not to do in a situation or other derogatory comments.

47.    On July 26, 2019, Plaintiff and other BATS participated in Raids Exercise #8.  The exercise was an individual scenario. Plaintiff was acting as part of a rescue team to support DEA. There was written script that each BAT was required to follow. Plaintiff was going into a "barricaded" house to rescue an undercover agent ("UC"). Plaintiff was to carry a radio and have approximately seven agents available to assist.  Plaintiff put on her mask which signaled the commencement of the exercise.  The Plaintiff was not

issued a helmet or other head or neck protection other than a DEA "cap" and a face mask that did not cover her entire head leaving her forehead exposed to potential injury. Plaintiff executed the beginning of the exercise as scripted. She took out her weapon and took the radio with her.  She approached the front door and entered the house identifying as DEA police.  Inside was a UC pointing a weapon at a subject who was lying on the floor.  The subject was told "don't move, I will shoot".  The UC collapses and falls into a chair.  The team was advised that there was an agent down and Plaintiff needed help. Plaintiff was aware that the subject on the floor had others in the house. Plaintiff looked toward the door she had entered to see if anyone was coming in and Sgt. Case began shooting at her with simulated ammunition ("simunition rounds").  She shot back with her left hand not to expose her entire body and to protect herself from being "shot" multiple times.

She began to feel hot and disoriented and started to sweat profusely and was hyperventilating and could not see clearly. She put her head down and began to taste blood and saw blood dripping.  She was unaware if this was part of the scenario or where the blood came from. She started shaking and tried to remember what she was doing. She told the team to enter through a window in the front of the house. They asked "what window?".  She went to the window and the scenario ended.  When she took off her mask she was still

confused and blood was in the room.   SA Macri approached and told her that shooting with her left hand is unsafe and to go and clean up after herself. He did not ask if she was okay or anything related to her obvious injury. She went to the bathroom to clean up feeling shaky and nervous and concerned for her well-being.

With her head hurting, Plaintiff walked out of the house and saw Chief De Leo and members of her group.   Chief De Leo asked if she was okay.   She asked about the scenario because she had been shot in the head and Chief De Leo said not to worry about it because it was a loose scenario and everyone gets shot at during the scenario. Chief De Leo told her that maybe she was not meant to be an agent but a model and she could walk showing off the round damage to her forehead. There was a physical therapist there and the Plaintiff told her that her head hurt. Nothing happened.  Her equipment had blood all over it. She took it to the medical facility to be sanitized.  She told the female there that her head hurt.  Plaintiff, with a massive headache, went to class. That night she began to feel nauseous and vomited. She felt very sick with a nonstop headache and vomiting.

48.   On Saturday, July 27, 2019, one of the BATs Plaintiff was with at the cafeteria told Plaintiff she needed to see a doctor because she may have a concussion. Plaintiff did not do so because DEA did not want anyone to visit a

doctor or hospital facility outside of the training facility.  Plaintiff knew that if she did otherwise, she would get in trouble with the staff.

49.     SA Macri was the evaluator of the Raids Exercise #8 scenario.  He was present when the Plaintiff was injured from the simunition round and did not stop the scenario and did not offer any medical assistance, first aid or to take her to the Health Services Unit ("HSU") on the facility grounds as was required by DEA policy. Rather it is believed that SA Macri added deficiencies that did not occur and told her it was unsafe to use her left hand to shoot and used that fact as an element to fail the Plaintiff in Raids Exercise #8. A firearms instructor confirmed that day that utilizing the left hand only was not a safety issue.

50.     SA Menino was also present during the scenario and witnessed the event and the injury to the Plaintiff. SA Menino did not stop the scenario and did not tell SA Macri to end the scenario due to the head injury to the Plaintiff nor did he offer medical assistance, first aid or send her to the HSU for a medical examination as required by policy.

51.     Unit Chief De Leo was, as were SA Macri and SA Menino, of no help to the Plaintiff and preferred to make a sexist and offensive comment rather than offer medical assistance.  SA Johnson, seeing Plaintiff's mask full of blood, made her put it back on to turn in her weapon, a disgusting act against an

injured BAT. Lastly, SA Bellamy, an instructor, saw Plaintiff covered in blood, hurt and laughed at her. No one offered any medical assistance.

52.     SA Macri, with input from other SA instructors, failed Plaintiff in this scenario because, as he stated in his affidavit, the Plaintiff did not complete the exercise.  This was the second alleged failure in Raids Exercises, namely, Raids Exercise #6 and Raids Exercise #8, and was a basis for dismissal from the training facility if the evaluations are valid, truthful and done without a history of harassment, discrimination and a hostile environment that existed for a long period of time and directed at the Plaintiff.  Also, the fact that the Plaintiff was injured and suffered a concussion from the simunition round that struck her forehead was not considered in her Raids Exercise #8 evaluation.

53.     All of the incidents stated above interfered with and negatively impacted Plaintiff's performance.  She was harassed daily by SAs Macri, Johnson and Menino.  Unit Chief De Leo allowed it to happen, ASAC Alznauer allowed it to happen and SAC Woolcock allowed it to happen. The constant harassment, humiliation and disparate treatment caused Plaintiff to believe that, in their eyes, there was no way that she could perform properly.  These three SAs would find deficiencies that did not exist.  She was told she would fail a particular exercise before a failure occurred. Plaintiff discussed this situation with Instructor Stramer and asked for assistance, Instructor Stramer evaluated

her and he said she was doing fine, that she followed protocol and there were no issues.

54. SA Johnson, SA Menino and SA Macri were determined to fail the Plaintiff. Their actions, as set forth herein, had no other purpose or intent but to discriminate against the Plaintiff and to make the training environment as hostile as possible for the Plaintiff. These actions establish that they acted unlawfully by discriminating against the Plaintiff as a Hispanic female. These same actions also establish that Plaintiff was intentionally harassed and subjected to a hostile work environment by these same employees and others employed by the Defendant.

55. On July 29, 2019, Plaintiff was summoned to the office of SAC Woolcock to address the alleged failure during Raids Exercises #6 and #8. SAC Woolcock was joined by ASAC Alznauer and a Class Coordinator Purefoy (first name unknown). Plaintiff tried to explain what had occurred in the Raids exercises and how she had been treated throughout the training sessions but SAC Woolcock was not interested. Nor was SAC Woolcock interested in the obvious injury Plaintiff sustained at the hand of a trained expert DEA employee who shot the Plaintiff in the forehead. Had proper safety measures and protective equipment been provided to the Plaintiff, this injury would never have occurred.

56.    On July 29, 2019, Plaintiff was dismissed from the training facility and ordered to return, by airplane, to the DEA Orlando District office on July 30, 2019. This act alone by SAC Woolcock and ASAC Alznauer, without having assessed Plaintiff's actual medical condition or having any concern for the Plaintiff's well-being at all, put the Plaintiff in a very dangerous position medically. Both SAC Woolcock and ASAC Alznauer failed to follow DEA policy regarding injuries to trainees as required.

57.    No other similarly situated BAT was subjected to the unlawful actions and disparate treatment engaged in by the DEA training facility personnel including, but not limited to SAC Woolcock, ASAC Alznauer, SAC Barbuti, Chief De Leo, SA Johnson, SA Menino, SA Macri and SA Nolan. SAC Woolcock was quickly laterally transferred to another SAC position shortly after the injury and dismissal of the Plaintiff from the training facility.

58.    On July 30, 2019, Plaintiff returned to the DEA Orlando District where she performed perfunctory duties until her termination by DEA.

59.    Upon Plaintiff's arrival at the Orlando District office, a DEA Special Agent observed the Plaintiff and noticed that here was something wrong. This SA had been familiar with concussion symptoms and Plaintiff was sent to an emergency medical facility where she was diagnosed with a concussion.

60.     During the period from July 30, 2019 to the date of termination, DEA Miami Field Division Special Agent in Charge Kevin Carter ("SAC Carter"), who had been made aware of Plaintiff's situation and injury by ASAC Marcus Anderson who supervised the Orlando District office, made a number of attempts to discuss Plaintiff's status, including pay status, and the manner in which she had been treated at the training facility with Assistant Administrator Sharyn Saunders, who had supervisory control over the training facility among other duties.  Ms. Saunders would not discuss Plaintiff's status or the unlawful actions of the training personnel and told SAC Carter that it was not his business despite the fact that the Plaintiff was assigned to the DEA Orlando Office which was within the Miami Field Division's sphere of influence.

61.     On September 17, 2019, Plaintiff's attorney sent a letter to the DEA's Acting Administrator, Uttam Dhillon, explaining the situation and seeking a resolution of the Plaintiff's status and explaining the mistreatment and discriminatory actions of the DEA training personnel and supervisory personnel.  The Acting Administrator never responded to the letter. The letter also requested that DEA Office of Professional Responsibility ("OPR") initiate an investigation into the actions of the training personnel.  Plaintiff was contacted by OPR in July of 2020. It is believed that none of the training

personnel were disciplined for their offensive and discriminatory actions against the Plaintiff.

62.     On October 5 and October 31, 2019, Plaintiff's attorney contacted DEA Principal Deputy, Preston Grubbs, again referencing the treatment of Plaintiff. He never responded directly tom the Plaintiff's attorney.

63.     On December 5, 2019, Plaintiff was informed that she had been terminated from the DEA by a letter signed by SAC Barbuti. The effective date of the termination was to be December 6, 2019. SAC Barbuti followed the directions of Assistant Administrator Sharyn Saunders and did not, to the best of Plaintiff's knowledge, independently assess Plaintiff's performance or investigate the actions of the training staff that he had become aware of through the filing of this EEO complaint and communication with the DEA Administrator in September 2019.

64.     On December 13, 2019, Plaintiff's attorney sent a letter to SAC Barbuti, who signed Plaintiff's termination letter, addressing this act of retaliation for filing a formal Equal Employment Opportunity complaint agist the Responsible Management Officials named herein. Plaintiff's attorney did not receive a response directly from SAC Barbuti but from the DEA Chief Counsel's office.

65.     Subsequent to her termination, Plaintiff continued to treat with and submit to a series of medical and mental examinations by a variety of physicians for the concussion she sustained during Raids Exercise #8.  Her final diagnosis from a Board-Certified neurologist confirms that Plaintiff suffered a serious and potentially life-threatening head injury caused by being shot in her forehead with a simunition round on July 26, 2019 while she was participating in a DEA training exercise.  Plaintiff has also been diagnosed with permanent brain damage that has negative effects on her memory, reaction time, taste and other maladies as a result of the injury sustained on July 26, 2019.

66.     All of the actions of the training personnel and supervisory personnel, taken against the Plaintiff from April 28, 2019 to December 6, 2019, including the failures in Raids Exercises #6 and #8, were a pretext for their discriminatory, hostile and retaliatory actions during the same period of time.

67.     Since October 2019, the Department of Labor, Office of Workers' Compensation Programs ("OWCP") has been paying for all of Plaintiff's medical expenses attributed to the injury(ies) sustained by the Plaintiff when she was a Basic Agent trainee at the DEA training facility, Quantico, Virginia.

## COUNT I

68.    Plaintiff, Saudhy M. Bliss, sues Merrick Garland in his official capacity as United States Attorney General for discrimination, retaliation, harassment and retaliatory hostile work environment under Title VII.

69.    Plaintiff incorporate by reference and realleges paragraphs 1 through 68 of the complaint.

70.    The Plaintiff engaged in activity which is protected under Title VII.

71.    As a direct and proximate result of the protected activity Plaintiff has suffered adverse employment actions, to wit, termination.

72.    The discriminatory, retaliatory and harassing actions were taken by supervisory personnel within the Department of Justice and the Drug Enforcement Administration component of the Department of Justice.

73.    The Department of Justice has intentionally maintained these retaliatory and unlawful practices to the detriment of the Plaintiff as an employee.

74.    The harassment by Department of Justice personnel in the Drug Enforcement Administration created an intolerable hostile work environment.

75.    The discriminatory actions by the Defendant and its personnel, including the DEA, have created an intolerable hostile work environment.

76.    The retaliatory actions of Department of Justice personnel have created an intolerable hostile work environment.

77.   The Defendant at all relevant times, knew or should have known, of the discriminatory, and harassing retaliatory actions being taken against the Plaintiff in that its personnel were present, witnessed and acquiesced to the unlawful actions.

78.   The Defendant failed to take necessary action to prevent or correct the retaliatory actions being taken and, in fact, ratified such conduct by its inaction.

79.   The Defendant, through its supervisory and training personnel Human Resources personnel, including but not limited to, Assistant Administrator Saunders, SAC Woolcock, SAC Barbuti, ASAC Alznauer, Unit Chief De Leo, SA Nolan, SA Macri, SA Johnson and SA Menino, Sgt. Case and other unknown personnel have engaged in, directed, and/or ratified retaliatory conduct and frustrated the Plaintiffs' efforts to obtain relief under Title VII and the Civil Rights Act of 1964, as amended.

80.   The Defendant, through acceptance of such conduct, has fostered an attitude among supervisors and other DEA personnel that harassment, discrimination and retaliation against employees in order to discourage the reporting of misconduct or to engage in or participate in protected activity, including EEO activity, is an acceptable employment practice by supervisors

and other employees at the DEA Human Resources office, the DEA Training

Facility at Quantico, Virginia and in the DEA generally.

81.    The Defendant and the DEA have engaged in and allowed unlawful

actions, such as retaliation, that "well might have dissuaded a reasonable

worker from making or supporting a charge of discrimination" for fear of

retaliation, harassment and/or discrimination for doing so.

82.    Because of the willful actions of the Defendant and its supervisors, and as

a proximate cause thereof, the Plaintiff has been and continues to be denied

her right to equal employment opportunities in violation of the Civil Rights

Act of 1964, as amended and 42 U.S.C. § 2000e *et seq*.

83.    As a result of the foregoing, the Plaintiff has been damaged.  Such

damages include, but are not limited to termination, maltreatment, loss of

income, harm to her professional reputation, permanent physical and mental

impairment, loss of pay into the future, loss of training, humiliation,

degradation, embarrassment, severe emotional suffering and has suffered a

permanent loss of opportunity to serve in a law enforcement capacity as a

DEA Special Agent or in any federal law enforcement agent and any state or

local law enforcement position. The Plaintiff will continue in the future to

suffer the same damages absent relief from this Court.

84.   The Plaintiff has satisfied all conditions and precedent to the filing of this suit.

WHEREFORE, the Plaintiff requests protective relief, a judgment for damages, attorneys fees and costs and such other and further relief this Court deems just and proper and for a trial by jury on all issues so triable.

## COUNT II

85.   Plaintiff sues Merrick Garland, in his official capacity as the United States Attorney General, for gender discrimination, sex (female) and disparate impact under Title VII.

86.   Plaintiff incorporates by reference and realleges paragraphs 1 through 85 of the complaint.

87.   The Defendant has followed a course of conduct which results in disparate treatment between female and male employees. Plaintiff, Saudhy M. Bliss, was treated in a negative and hostile manner, was subjected to unauthorized harassment, maltreatment, humiliation, intimidation and threats by DEA training personnel with the acquiescence of supervisory personnel who witnessed the unlawful actions. All of the male employees/trainees in the Basic Agent trainee Class were treated differently and none of them were subjected to humiliation, intimidation and harassment, being constantly demeaned or terminated as was the Plaintiff. Male employees/BATs were

afforded opportunities to improve their performance that were not offered to the Plaintiff. No other similarly situated employee has been subjected to such actions. The Defendant's practice of disparate treatment in favor of men cannot be justified as a business necessity.

88.     As a direct and proximate result of Defendant's actions, Plaintiff, Saudhy M. Bliss, has been denied equal employment opportunities in the terms and conditions of employment by the Defendant because of sex (Female).

89.     All of the above discriminatory actions were taken by supervisory personnel and training personnel within the Department of Justice and the Drug Enforcement Administration specifically in order to deprive Plaintiff of employment and other employment action because of her gender (female).

90.     The Defendant has intentionally maintained these discriminatory and unlawful practices to the detriment of its employees including Plaintiff.

91.     The above referenced actions created an intolerable hostile work environment for Plaintiff during the period from April 28, 2019 to December 6, 2019.

92.     The Defendant, at all relevant times knew or should have known of the above referenced discrimination against the Plaintiff.

93.     The Defendant has failed to take the necessary action to prevent or correct the complaint of discrimination and, in fact, has ratified such conduct.

94.   The Defendant, through ASAC Burkett, RAC Alvey and GS LaRocca and others not in her chain of command, has engaged in, directed or ratified conduct and denied and frustrated Plaintiff's efforts to obtain relief under Title VII.

95.   The Defendant, through acceptance of the complained conduct, has fostered an attitude among supervisors in the Port St. Lucie Resident Office, the West Palm Beach District Office and throughout the Miami Field Division that gender discrimination (female) and the imposition or causing a hostile work environment are acceptable employment practices.

96. Because of the willful actions of the Defendant and its supervisory personnel, and as a proximate cause thereof, Plaintiff has been and continues to be denied her rights to equal employment opportunity in violation of Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq*.

97.   As a result of the foregoing, Plaintiff has been damaged.  Such damages include, but are not limited to termination, loss of pay, loss of office space, loss of an amicable work environment, loss of career opportunities, harm to her professional reputation, humiliation, degradation, embarrassment, severe emotional suffering and distress and has been required to accept employment at a lower pay scale than what she would have received as a Series 1811,

Criminal Investigator, GS-13 and above.  Plaintiff will continue to suffer the same damages in the future absent relief from this Court.

98.    The Plaintiff has satisfied all conditions precedent to the filing of this suit.

**WHEREFORE**, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## COUNT III

99.    Plaintiff sues Merrick Garland, in his official capacity, as the United States Attorney General, for discrimination based on sex (female), color (Brown), and national origin (Hispanic Puerto Rico).

100.    Plaintiff incorporates by reference and realleges paragraphs 1 through 99 of the Complaint.

101.    The Defendant has allowed a course of conduct which results in disparate treatment for individuals who are Hispanic, brown skin and of Hispanic  national origin. Plaintiff was treated in a negative and hostile manner, harassed, intimidated, humiliated by DEA training personnel, including supervisory personnel and discriminated against based on her race, color,  and national origin.  The white (Caucasian) BATS, especially the white female BATS, were treated differently and were not subjected to humiliation, intimidation, harassment, constantly being demeaned and belittled or

terminated in the same or similar manner as was the Plaintiff. No other similarly situated employee was treated or subjected to such actions. The Defendant's practice of disparate treatment of Hispanics and brown skinned individuals cannot be justified as a business necessity or justified on any reasonable basis.

102.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has been denied equal employment opportunities in the terms and conditions of employment by the Defendant because of race, color and national origin.

103.    All of the above discriminatory actions were taken by supervisory personnel within the United States Department of Justice and its Drug Enforcement Administration specifically in order to deprive Plaintiff of employment and other employment action because of her sex (female), color (brown) and national origin (Hispanic Puerto Rico).

104.    The Defendant has intentionally maintained these discriminatory and unlawful practices to the detriment of its employees including Plaintiff.

105.    The above referenced actions by the Defendant's employees created a disparate and intolerable hostile work environment based on sex, color and national origin discrimination during the period from April 28, 2019 to December 6, 2019.

106.    The Defendant, at all relevant times, knew or should have known of the above referenced racial discrimination against the Plaintiff.

107.    The Defendant has failed to take the necessary action to prevent or correct the complaints of sex, color, and national origin discrimination and, in fact, has ratified such conduct.

108.    The Defendant, through SAC Woolcock, SAC Barbuti, ASAC Alznauer, Unit Chief De Leo, SA Macri, SA Menino, SA Johnson and SA Nolan SA has engaged in, directed or ratified such conduct and frustrated Plaintiff's efforts to obtain relief under Title VII.

109.    The Defendant, through acceptance of the complained conduct, has fostered an attitude among the supervisory and training personnel at the DEA training facility that racial discrimination (color, sex and national origin) and the imposition of or causing a hostile work environment are acceptable employment and training practices.

110.    Because of the willful actions of the Defendant and its supervisory personnel, and as a proximate cause thereof, Plaintiff has been and continues to be denied her rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended and 42 U.S.C. §2000 *et seq.*

111.    As a proximate result of the foregoing unlawful acts, Plaintiff has been damaged. Such damages include, but are not limited to termination, loss of

pay, loss of an amicable work environment at the DEA, loss of career

opportunities, harm to her professional reputation, humiliation, degradation,

embarrassment, severe emotional and physical suffering and has been required

to accept employment at a lower pay scale than she would have received as a

Series 1811 Criminal Investigator, GS-13 and above.  Plaintiff will continue

to suffer the same damages in the future absent relief from this Court.

112.    The Plaintiff has satisfied all conditions precedent to the filing of this suit.


## DEMAND FOR JURY TRIAL

        The Plaintiff, Saudhy M. Bliss demands a trial by jury on all issues so
triable.


DATED:   March 7, 2022                        Respectfully submitted,

                                              Domenic A. Lucarelli, Esq.
                                              Lucarelli Law, P.A.
                                              Fl. Bar ID No. 967068
                                              351 Airport Pulling Road
                                              Naples, FL 34104
                                              (239) 775-8889
                                              lucarellilaw@comcast.net
                                              Attorney for the Plaintiff